IN THE UNITED STATES COURT OF FEDERAL CLAIMS

SWIFTSHIPS, LLC, )
Plaintiff, )
vs. ) Case No. 24-1661C
UNITED STATES OF AMERICA, )
Defendant. )

***CORRECTED***

Courtroom 8
Howard T. Markey National Courts Building
717 Madison Place, N.W.
Washington, D.C.
Tuesday, July 8, 2025
10:00 a.m.

BEFORE: THE HONORABLE ARMANDO O. BONILLA

Deborah Wehr, RPR, Reporter

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:

FAISAL M. GILL, ESQUIRE
Gill Law Firm
1101 30th Street
Suite 500
Washington, D.C. 20007
(202) 625-4898
fgill@glawoffice.com

ON BEHALF OF THE DEFENDANT:

STEPHANIE FLEMING, ESQUIRE
U.S. Department of Justice
Post Office Box 480
Ben Franklin Station
Washington, D.C. 20044
(202) 616-0170
Stephanie.fleming@usdoj.gov

ALSO PRESENT:

DAVID RUDDY, Department of the Navy
MATTHEW HAWKINS, Department of the Navy

P R O C E E D I N G S

\- - - - -

(Proceeding called to order, 10:00 a.m.)

THE COURT: We are here for oral argument this morning in Swiftships, LLC, versus the United States, docket number 24-1661, more specifically, Defendant's motion to dismiss, ECF number 7. Counsel for the Plaintiff, please enter your appearance for the record.

MR. GILL: Good morning, Your Honor. Faisal Gill for Swiftships.

THE COURT: Good morning, counsel. And for the United States?

MS. FLEMING: Good morning, Your Honor. Stephanie Fleming for the United States. Also with me from the Navy are David Ruddy and Matthew Hawkins.

THE COURT: Good morning, counsel. I will start with a note that I was underwhelmed by the parties' briefs in this matter. It required a lot of behind-the-scenes legwork by me to prepare for oral argument. And Mr. Gill, in particular, a seven-page opposition to a motion to dismiss a claim that is worth, in your estimation, $150 million, left me wanting, to state the obvious or perhaps not obvious. And I hope that we use today's argument and you have adequately prepared to answer my questions to better use of

everyone's time.

With that, Ms. Fleming, your motion. You proceed first.

MS. FLEMING: Thank you, Your Honor.

THE COURT: And I would like to start with a few factual questions because both parties did not give me all the information I needed, at least as far as background is concerned, to make sure that I fully grasp what was at issue. But the February 2017 solicitation, as I can best tell, called for the design, construction and delivery of up to 32 vessels between 2022 and what I was not clear of, whether it was through 2026 or '27.

MS. FLEMING: I don't know that I can immediately answer that question, Your Honor. I think that there were staggered delivery dates. One thing proposers for the solicitation were asked to do was provide a schedule for delivery. That schedule was amended throughout the contract at certain points, particularly in 2022 when there was a bilateral modification.

THE COURT: I understand the subsequent amendments. My question is at the original requirements was it a five-year contract? A four-year contract? Because the dates keep slipping and both parties are not consistent in relating what those dates were and became. Although not material to today's motion, I want to make

sure I fully grasp what has happened in this case.
MS. FLEMING: If I could ask the Court's indulgence for a moment?
THE COURT: Please. That's why I require agency counsel at every proceeding.
MS. FLEMING: Your Honor, the agency is not entirely sure what the base period of the contract was. There were certainly options that could be exercised that would have extended it. We're happy to provide that in a supplemental submission to the Court, if that would be helpful.
THE COURT: Mr. Gill, can you shed any light on that?
MR. GILL: It was 2027, Your Honor.
THE COURT: Thank you. And then the March 30, 2018, award to Swiftships was for one LCU, even though the contract allowed for up to 32, but the original delivery date is all over the map. I see dates of July 28, 2020, ECF 1-2 at 73. I also see November 5th of 2020, ECF 1-6 at 1. Any idea what the original date was?
MS. FLEMING: No, Your Honor, not at this time.
THE COURT: Mr. Gill?
MR. GILL: It was July 2020, Your Honor.
THE COURT: And I understand the original

contract price was just over $18 million?

MS. FLEMING: Yes, Your Honor.

THE COURT: And over the next three years NAVSEA added 11 vessels, increasing the total price to over $180 million, as I understand it?

MS. FLEMING: I believe it was up to seven vessels, if I have that correct.

THE COURT: My understanding is it went to 11 and then dropped down to seven through contract modification 41.

MS. FLEMING: I would defer to the Court. I can't provide you a hundred percent confidence on that issue.

THE COURT: Mr. Gill?

MR. GILL: Yes, Your Honor, it was 11 and then it went back down to seven.

THE COURT: And the $180 million price tag?

MR. GILL: Around there, yes, Your Honor.

THE COURT: And then we get back to contract modification 41, which was issued on September 27th of 2022, where NAVSEA reduced the number of deliverables from 12 to seven LCUs and adjusted the contract price to nearly $160 million. Does that sound true or accurate?

MS. FLEMING: It is accurate that they adjusted downward the price to account for the additional

vessels. But the modification also added, I believe, about $41 million to the price for the vessels that remained in the contract.

THE COURT: Right. So we start out with we can have 32 vessels? But for the contract we are going to have one to make sure it's done properly and we are going to pay you $18 million for the one. Then NAVSEA said, you know what, we'll take 11 more. I think it was adding two, adding four, adding seven and wound up being a total of 12 for a cost of $180 million.

Then through contract modification number 41, it reduced the number of vessels to seven from 12 and decreased the contract price from $180 million to $160 million, but on average, the per-vessel rate went up.

MS. FLEMING: That's correct, Your Honor.

THE COURT: That is what we call the unit price?

MS. FLEMING: Yes, Your Honor.

THE COURT: And I understand that throughout contract performance as of the date of the termination, NAVSEA paid Swiftships about -- or roughly $101 million in progress payments?

MS. FLEMING: We believe that is approximately correct, yes, Your Honor.

THE COURT: And received zero ships in return?

MS. FLEMING: True.

THE COURT: And I was trying to follow the calendar, but at some point expected delivery of the first LCU slipped to June of 2023 with the second and third deliverables due on September 29th and December 29th of 2023?

MS. FLEMING: That's correct, Your Honor.

THE COURT: What is the difference between a letter of concern and a cure notice?

MS. FLEMING: To describe it colloquially, the letter of concern is a warning that you are about to get a cure notice. And the cure notice is a contractually required notification.

THE COURT: And the letter of concern is almost a courtesy? It is not a requirement?

MS. FLEMING: Yes.

THE COURT: So we'll move on to legal arguments now, and where I'm struggling with your motion is I must accept as true all of Mr. Gill's allegations of fact. Legal allegations are not required by me to accept. But how do I balance accepting all of the allegations of bad faith against the presumption of good faith and regularity?

MS. FLEMING: Well, I'm happy to address that, Your Honor. It might be useful for me to first

procedurally walk through the claim and the ultimate suit here because I think there are some nuances that perhaps weren't apparent in the motions that might be useful to the Court.

THE COURT: If you could just begin, though, with before we get into the allegations, the ten examples that the Plaintiff cites, I want to know what framework I should be adopting. Is it the well-nigh irrefragable proof of bad faith versus the presumption of good faith layered on top of the fact that this is a motion to dismiss and not a summary judgment or a trial? And how do I accept these arguments on the front end before you start giving me the arguments is my question.

MS. FLEMING: Well, one place to start, Your Honor, is just the fact that some of the allegations within the complaint are contradictory. They are internally inconsistent. So certainly no pleading standard has been met for those allegations.

But as you point out, the standard for bad faith is quite high. In order to have a basis to investigate some of the bad faith complaints, you could first ask whether the complaint is appropriately framed within a contract action. So for instance, if the claim that the Plaintiff is pursuing, this claim stream about a need for additional costs being paid for the resistance of

the Navy to continually delay the deliverable period for the Plaintiff, if that is the claim stream, then an allegation about some conversation with an admiral seems quite removed from that issue. Likewise, the Plaintiff makes a lot of allegations of bad faith related to other contracts. That has nothing to do with a contract action here or the claim. It isn't linked at all.

THE COURT: Well, it could exhibit animus of the contracting officer and all of the folks at NAVSEA were not pleased with the performance and the pace that Swiftships was working under and decided to, according to the Plaintiff, destroy the business. And one of those ways is to not only undermine their ability to perform this contract but to cut off every stream of revenue that NAVSEA was aware of.

MS. FLEMING: I would say that the Plaintiff has not squared that circle in the complaint. To make the allegation of, you know, animus related to other contracts and then bring it back to an action that occurred for this contract. Some of the claims they are making about other contracts that were not given to it fell long outside of the period of actual conduct they are complaining about for the primary contract involved in this suit. So there's a temporal problem with using the animus of sort of later actions to describe things

that have already happened. I think that's a baseline. They are just outside the course of this contract. But certainly if --

THE COURT: Are they also torts?

MS. FLEMING: They are not only torts, there's actions you can take as a contractor to pursue problems you have with the award of other contracts, and the Plaintiff hasn't taken any of those actions. You can lodge a bid protest, right. We are very familiar with that remedy here.

THE COURT: But those are foreign contracts. Mr. Gill couldn't file a claim in this court for a Malaysian contract.

MS. FLEMING: But they could file a tort claim for interference with some obligation they think they have.

THE COURT: In District Court?

MS. FLEMING: In District Court. Not in this court. So there are other remedies if the Plaintiff really believes they have been harmed in those ways. And particularly given the high standard for bad faith, those kinds of arguments seem very untethered to the good faith and fair dealing and bad faith claims they have made for this contract.

THE COURT: What about the CPARS review and the

closure of the portal 48 hours before the response was scheduled to be submitted?

MS. FLEMING: We don't think that that's necessarily accurate.

THE COURT: But that's what they've pled and that's what I have to accept.

MS. FLEMING: I understand, and I agree that's the standard here. Let's assume that that's true for the moment. The CPARS rating they have claimed is not accurate, But the CPARS rating reflects the fact that they failed to deliver anything under the contract, a fact they have admitted is true.

THE COURT: Right, but they are also laying blame for that delay at the feet of NAVSEA for delaying the design, costing them time, critical time because of the pandemic, and then they couldn't get the supplies -- they couldn't order or pay for the supplies and get them in on time to deliver on time.

MS. FLEMING: And they shouldn't be able to make any of those arguments, Your Honor, because they already waived the right to pursue them as part of the modification issued in September of 2022.

THE COURT: Right, but the allegation is that that modification was derived through coercion and duress based upon the same allegations that are made in

other parts of their complaint.

MS. FLEMING: That, Your Honor, I would say, is a legal conclusion that they have asked you accept as part of their complaint, like that duress happened is a legal conclusion. The facts surrounding what they claim created duress are -- we could accept as they pled it, but what they've pled is not sufficient from a legal standard for duress. Rather, in order to meet two of the three prongs of a duress complaint, they have to show that circumstances permitted no alternative but executing the modifications case and that such circumstances were the result of the other party's coercive acts.

So first, Swiftships did not sufficiently allege that they had no alternative but to sign the modification. They could have pursued a request for equitable adjustment. They could have pursued a claim before this Court back in the day. But what they alleged instead was they, quote, had to agree to the Navy's terms, quote, in order to receive any increase in funding at that time. So they weren't left with no choice. They had to choose whether to take a bird in the hand now or to wait for potentially some greater relief in the future, and they chose the first option. That's not no alternative.

THE COURT: And do you know by the September 2022 time date or the deadline or the execution of the clean waiver how much in-progress payments had been made to Swiftships at that point?

MS. FLEMING: I don't know exactly. I believe that as of 2023 no more payments were provided. So I think we were at $100,000 or thereabouts. Yes, that's correct. So not only did Swiftships fail to allege that there was no other alternative here, they didn't sufficiently allege that the Navy coerced their agreement with the payment. Rather, what they said was that they were, due to the escalated costs of materials, a consequence of market inflation triggered by the pandemic, forced to agree because of economic pressure.

But as we can see from the Rumsfeld case, in fact, economic pressure alone is not sufficient to show coercion. Rather, where we do see in the rare event coercion has been found, it's because specifically the one party has threatened to withhold payments entirely in order to coerce agreement with the modification. But the Navy did not do that in this case. They haven't alleged that the Navy has done that in this case.

THE COURT: Well, it was we are not going to make any progress payments until progress has actually caught up to what has already been paid.

MS. FLEMING: That's just a fact of how the contract works. That's not a new threat designed to coerce them.

THE COURT: The fact that the Navy had a tool at its disposal and wasn't using it and opted to then use it can be perceived, if in the extreme, as a threat.

MS. FLEMING: What tool are you suggesting?

THE COURT: The withholding of progress payments. Under the terms of the contract, they were authorized to do it in their discretion but they hadn't done so yet, and now they were saying we are not going to make any more payments.

MS. FLEMING: I think that interpretation requires the Court to look at any contract where an obligation is owed and say that is coercion. I don't think you can make the case that anything other than the existence of the right under the contract existed here. There's no documentation, there's no allegation from Swiftships in their complaint that they were forced to sign this modification because the Navy told them they would not receive payments. So they haven't made that allegation here.

And moreover, in the case, I believe it's David Nassif Association versus United States, it's a Court of Claims case, where they found that a withholding of

payments was sufficient to show coercion, it was because -- it was also a case where the modification involved a reduction in the payments that the contractor was going to receive. In this case, the contractor actually got more. They got $41 million and change, more per unit for the ships that were on order out of this modification. So they benefitted from it.

THE COURT: And what is the difference between a clean release and a general release?

MS. FLEMING: Well, I think the general release releases all claims without conditions as a matter of course. But a clean release makes it clear in the language that there are no conditions, right. So to put that in context in this case, the release language was over-the-top clean. You know, it said not only do we release all claims, it's releasing all rights to any entitlement of any and all costs under any and all impacts upon this contract, whether such costs and impacts are known or unknown on or before the 1st of September 2022. It goes on and there's another section called Covered Events that specifies the circumstances within which events could not be raised under this waiver.

But the point of this release is that it clearly does not limit the application of this release of rights

on any other conditions aside from the subject matter which, again, we clearly think was achieved here. The release in that case, in mod 41 specifically, was designed -- and the purpose of the modification was designed to resolve Swiftships' submitted three REAs which covered design, colocation and material REAs. So they are suing -- their complaint addresses delay-related costs and issues and material-related costs and issues. So that's squarely within the scope of the waiver that they executed as part of mod 41.

THE COURT: That predate September of 2022?

MS. FLEMING: That's correct.

THE COURT: So in the Government's position, what examples among the ten qualify as pre September 2022?

MS. FLEMING: Certainly the first three, Your Honor. So the first hundred-odd paragraphs the complaint all cover the period prior to the execution of this modification. But in addition, if you look at some of the further examples, they all relate back to behavior that happened prior to 2022.

THE COURT: The letter of concern was dated what? Because that's example number 3.

MS. FLEMING: Example number 3 is retaliation. That's the title of the example, but it relates back to exactly what was resolved in the 2022 modification. You

know, they talk about, for instance --

THE COURT: Let's get back to my point. You say that example number 3 is the Navy's retaliation, and paragraph 99 talks about the February 10, 2023, letter of concern. How is that waived under the clean agreement or clean release if that clean release waives claims prior to September of 2022?

MS. FLEMING: Well, I think that the letter of concern on February 10th is a reflection of the Navy's concern that the agreement and the modification was not being complied with. The schedules provided were not going to be complied with by Swiftships given the lack of progress since they agreed to these new dates for delivery.

THE COURT: Right, but now you are impugning the waiver to language or a letter that wasn't sent for an additional four months or five months. So even if it reflects backwards, the complaint here is pled saying that this letter of concern was part of a pattern and practice of retaliatory conduct by the Navy. I do not see how I can find that Swiftships would have thought, hey, there may be a letter of concern coming down the road and I'm going to waive that too.

MS. FLEMING: Well, I think if you look further into this section, this example, the paragraphs go on to

talk about --

THE COURT: The July 2023 delivery date, the workforce shortage and then the symposium about employees on March 21st of 2023, paragraphs 106, all of these, and then there's a reference to April 2023, all of these postdate the alleged waiver.

MS. FLEMING: They do postdate the alleged waiver.

THE COURT: The facts might bridge, but if the allegation is all of these events that happened after the waiver were retaliatory, those can't be waived. Those are new facts. They may be reflective of things that happened before, during and after the waiver, but you don't waive everything in the future that has to deal with "relates to" -- what if you could also argue that the termination for default in 2024 was also waived.

MS. FLEMING: I don't believe that Swiftships actually alleged a challenge to the termination for default.

THE COURT: I just want the Government to be very careful on dates when you are saying that they waived things if those -- if the acts being alleged as retaliatory postdate the waiver. You are overplaying your hand on this one.

MS. FLEMING: I hear you. Let me just respond by looking at the claim that the Plaintiff submitted. So I'll leave that aside, but I think what we would say --

THE COURT: You raise a good point. I was also bothered by the fact that neither party submitted for the Court's review the certified claim submitted by Swiftships. Only the contracting officer's final decision was submitted. So it's this incomplete documentation which frustrated the Court's efforts to duly prepare for this hearing.

MS. FLEMING: I apologize, Your Honor. We are happy to do that in supplemental briefing. I realize that's an imperfect solution for today. But to return to the complaint, I think we would concede to the Court that on its face that the waiver does not cover actions taken after September 2022, but I think the theme throughout a lot of the complaints that Swiftships has included involve Swiftships' frustration that the Navy is not responding to its workforce, its staffing, its funding issues that are part of the same theme that it developed prior to the modification.

THE COURT: Okay. So based on that representation, the Government stands by its contention that examples, at least 1 and 2, are waived. Three bridges but doesn't completely fall under the waiver,

according to the Court's interpretation. Are there any other examples that fall within the ambit of the waiver, according to the Government?

MS. FLEMING: Again, given the timing of the waiver, I think the remaining allegations largely occurred after the waiver was executed, but for instance, the Navy's attempt to bankrupt Swiftships, which is example number 4, again, continues this theme where financial problems that Swiftships erred and sought a solution and a settlement for as part of that modification continued to affect its actions. In fact, they refer to, in paragraph 119 -- and again, this is part of example 4, if the Navy had accepted Swiftships' original REA of 73 million hand change, Swiftships would not be classified in their overprogressed category. So Swiftships itself is saying, like, the overprogressed determination by the Navy is wrong because you are not accounting for the fact that essentially they waived their ability to seek that additional REA.

So I would just submit that as part of our suggestion that the theme is echoed, and should the Court determine that Swiftships can continue to pursue those remaining examples, we would suggest that there be an instruction that they not continue to try to litigate as part of those claims. It's grievances over the scope

of the modification.

THE COURT: And perhaps to your benefit, what about example number 9, which talks about events that transpired in 2021 involving the Malaysian government? We've already talked about the fact that this might be a tort, but would this fall under any waiver to the extent that I have jurisdiction to consider this allegation?

MS. FLEMING: To the extent that they are alleging a lack of good faith as a pattern, you know, forming the basis for the behavior before September 2022, I would agree that that example 9 should be part of the waived material.

THE COURT: Okay. Help me better understand the parties' disagreement, for lack of a better term, regarding who owned responsibility for the design of the LCU vessels.

MS. FLEMING: Well, there's a reason why might be a little opaque, Your Honor. It's because there were different parts of the process that allocated responsibility to other people -- or that allowed the participation of other people. So for instance, at the solicitation stage, the Government, the Navy, offered a preliminary design. The solicitation was designed to elicit proposals from someone who could essentially complete that design, to provide the detail and respond

otherwise to the needs of the program.

But there also is a provision in the contract that called for a joint group between the Government and Swiftships to basically consult on the design. And as part of that provision, the Navy's role was limited to the provision of government expertise, and it expressly said that provision of expertise shall not relieve the contractor of responsibility for any design or construction decisions.

So to summarize, it was Swiftships that had the responsibility for design but it had to listen to the Government and its provision of expertise as part of the process for executing that design.

THE COURT: But Swiftships is citing provision C.1.1.5, and that states the contractor is solely responsible for the overall engineering, design, procurement, integration, installation and testing of the craft and any individual systems. And so Swiftships cites that provision and says the Government unduly delayed them in bad faith because they wouldn't let them proceed with the design and construction of these ships.

MS. FLEMING: Well, we would disagree with their characterization, but taking as true --

THE COURT: Well, it's a legal conclusion. I don't have to take it as true.

MS. FLEMING: Legal conclusion. I think that what they are pointing to is preceded by the paragraph I just referred to, which is C.1.1.8, where the provision of government expertise is something that Swiftships is directed to consider. But even there, that paragraph agrees that this should not relieve the contractor of the responsibility for any design or construction decisions.

THE COURT: So does it mean that they are taking all the blame and the Navy takes all the credit?

MS. FLEMING: It means that they have assumed the risk and they have the responsibility for delivering the final product, but they do have to listen to the Navy about the process. It doesn't require them to accept something particular from the Navy aside from the preliminary design, which they are directed to begin with.

THE COURT: Is there a distinction between detailed design and general design?

MS. FLEMING: The distinction here is only in relation to the preliminary design that the Navy provided with the solicitation. That is they provided a basic idea of what the ships should look like and what their specifications should include. And then executing it, providing additional detail, I'm sure an engineer

could describe this better, was up to the contractor under the contract.

THE COURT: And what am I to make of Swiftships' claims that the preliminary design was so wholly inadequate that it set Swiftships back time that they needed to complete these designs before they could complete construction?

MS. FLEMING: Since they had the design at the solicitation phase, it's hard for me to understand why that wouldn't be, you know, a patent error that they should have raised prior to the award of the contract. I don't think that you should credit that much at all. The Navy doesn't believe that their preliminary design was inadequate, but if it were, this is a little bit late in the day for Swiftships to make that claim.

THE COURT: Anything else before I hear from Mr. Gill?

MS. FLEMING: Just briefly, Your Honor, we touched on the idea of termination for default, and I thought it would be useful to provide just a little bit more procedural detail here for the Court because some matters have evolved after the entry of our motion to dismiss.

The claims that are being raised in this complaint actually began, you know, soon after the

modification but certainly with the submission of Swiftships' December 6, 2023, REA. And that's at ECF 1-3. And that referenced the modification complaint about the take-it-or-leave-it settlement and otherwise complained about the impacts on Swiftships' workflow arising from inadequate funding, withholding the funding, resolving funding issues. This just, again, circles the square that even in 2023 the REA, that sort of beginning of the claim at issue here was looking backwards at behavior that happened prior to the modification.

In February 21, 2024, possibly February 20, 2024, Swiftships submitted their certified claim originally. It echoed the same allegations and requested relief based wholly on a breach of good faith and fair dealing throughout the majority of the duration of the contract. That original claim is the basis for this suit though it's not the latest claim before this suit was filed.

About the same day, February 20, 2024, the Navy issued a notice of termination, and it cites as the basis for that notice -- this is at ECF 1-4. This cites the basis as Swiftships' failure to deliver any LCUs and other issues to identify consistent delivery dates and otherwise not even abide by the schedule it agreed to in the modification 41 issued nine months previously.

So that notice of termination was sent on February 20, 2024. The Plaintiff alleges it received it on the 21st. But regardless, the important fact is this claim, this certified claim was submitted on or about the same day as the notice of termination from the Government. But after that there's no submission from Swiftships challenging the termination itself. The first complaint filed in this case, that was in case 24-361, does not allege a challenge to the termination for default. The amended complaint they filed --

THE COURT: And the complaints are nearly identical?

MS. FLEMING: They are nearly identical. The amended complaint filed also in the previous case added example 10. Example 10 is Swiftships' allegation that the Navy took property and materials from one of its sites.

THE COURT: That was leased property?

MS. FLEMING: It was leased property. And this isn't really developed the record, but the Government had received a notice from the landlord for that property that he was terminating the lease. And in an effort to secure property that under the termination for default terms the Navy had a right to access, the Navy went ahead and took that property after providing notice

to the Plaintiff. That is --

THE COURT: Over their objection?

MS. FLEMING: Over their objection, that's right. There are other sites that continue to have materials related to this contract that the Plaintiff has either leases or rights to that the Navy has not moved to secure because, again, this was just based on the landlord saying they are about to evict Swiftships from this specific site.

THE COURT: And the Navy's right to reprocure that property or procure that property or recover that property from the site was based not pursuant to the written terms of the contract but a reference to a FAR provision, 52.249-8, which allows for the recovery?

MS. FLEMING: Well, if you look, Your Honor, at the contract, which is at docket 1-2 page 128, this is the reference to the default clause that you mentioned, it also includes the modification to that, and it includes it in the text of the contract. It says in addition to other remedies, the Government may, by contract or otherwise, with respect to work terminated as permitted in this clause proceed with the completion -- it just goes on to say basically that we can take the stuff or if you let us, we can use your site to complete the construction of the vessels. But

that text is in the contract.

THE COURT: And there's a reference in the contracting officer's decision that there was a court order which allowed the entry of persons on the property to retrieve such property. Am I misreading or reading too much into the contracting officer's decision?

MS. FLEMING: We think, Your Honor, what's being referenced is the order of eviction, and that, again, was the intelligence from the landlord for the specific site.

THE COURT: It says local court order for a writ of possession of site 5. And I am citing ECF 1-6 at 3, paragraph 13, in the contracting officer's final decision dated 5 September 2024.

MS. FLEMING: I see that, Your Honor. The context states that the court order requires Swiftships to vacate site 5 by March 6th at 5:00 p.m. So again, I believe this is a reference to the eviction order from the landlord against Swiftships and not any action that the Government took before a court.

THE COURT: Okay.

MS. FLEMING: So just getting back to the short procedural narrative, the amended complaint added example 10 but, again, did not challenge the termination -- the T4D in the final decision of the

contracting officer. That case was eventually dismissed because of jurisdictional -- excuse me, we moved to dismiss because of a jurisdictional problem. Swiftships elected to withdraw its complaint, dismiss it voluntarily in an effort to allow the Navy the option to continue considering its claim and reach a resolution. It eventually did, at which point that claim was denied. And Swiftships submitted its certified claim, which again, is not attached to this complaint, but that certified claim essentially echoes the original certified claim focusing on the good faith, fair dealing and bad faith allegations and not challenging the termination.

The new complaint, which does reference the fact of termination, does not challenge it. In fact, at one point they characterize it as an attempt at default termination, but at no point do they say "this termination is wrong and we challenge it." They don't do that, and their single-count complaint focuses only on good faith/fair dealing/bad faith arguments.

So the appeal period for challenging the default for termination expired in February of this year. They can no longer challenge it. It's now complete as matter of law. I think there's a question as to whether any claims can be maintained after that point, but certainly

they can't challenge the termination at this point forward.

THE COURT: Thank you, counsel.

Mr. Gill?

MR. GILL: Good morning, Your Honor.

THE COURT: I know I asked a lot of questions that the Government was unable to answer about the factual background of this case. Is there anything that I am missing in that regard or did not clarify to your satisfaction?

MR. GILL: No, Your Honor. I think you did. Before I start, may I ask, there's a representative from Swiftships here present. May I ask him to join me at counsel's table in case I have any questions that I might need to have answered for Your Honor?

THE COURT: Of course, and if you could introduce him on his way up?

MR. GILL: Absolutely, Your Honor. This is the director of contracting for Swiftships, Kaiser Gill.

THE COURT: Good morning.

MR. GILL: Your Honor, you hit the nail on the head when you were talking about the designs, when you were focusing on the designs. Had Swiftships been allowed to do what it thought it was being contracted to do was to basically control the design, focus on the

design, get the design done, we would not be here.

THE COURT: But these are not off-the-shelf purchases. The Government is not walking into the Walmart and saying "I'll take seven of these." Nor is this a modification of an off-the-shelf purchase. These are Navy vessels. How can the Navy cede responsibility and creative license, for lack of a better term, over the design of those ships?

MR. GILL: Your Honor, we are not asking the Navy nor did we ever say the Navy should not be involved, should not supervise, should not see what's going on. But the Navy should allow Swiftships to do what it knows what to do. This is not the first ship that Swiftships has built. Swiftships has been around for quite a long time.

THE COURT: Eighty years, I understand.

MR. GILL: Has been building vessels for quite a long time, back in the Vietnam era. So this is an experienced shipbuilder that has built the Navy, this particular office, NAVSEA, for quite a long time. So they know what they are doing.

THE COURT: This is where I'm struggling on this issue, because the contract specifically provides that Swiftships can propose modifications and says may propose such that clearly the Government, in this case

the Navy, has ultimate decision authority on what is to be -- how these ships are to be built. So how can I look at that provision, and that is C.1.1.13.1, entitled Contractor Proposed Alternates and Alternate Design Features. During the execution of the contract, the contractor may propose alternate design features for structure or hull form, propulsions and steering and/or craft systems. So if the contractor is proposing, that means ownership over the ultimate design doesn't lie with the contractor. It lies with the Navy.

MR. GILL: We are not contesting that the ownership does not align. What we are saying, Your Honor -- and again, first of all, I do apologize for a lack of more definite briefs. I did not realize. I assure you that will not happen again.

We are not alleging that the Navy could not say, "hey, the designs are not right" or could not ask for modifications. What we are saying is from the very beginning the Navy did not allow Swiftships to adequately do what it was supposed to do. The normal way it happens in every ship that's designed with NAVSEA is you have the contractor, they work with the contracting officer and PO, and they make a design and they submit it, and the Navy goes back and forth. There's an approval process and they say, no, change

this, change this, this or that, whatever it is, and then you have a set of designs and then you move forward and you construct the vessel. That did not happen here. That's why we are alleging bad faith. The Navy was not intending for Swiftships to ever complete this design, and that's why they did things that were not normal in normal shipbuilding.

THE COURT: If that's true, why would the Navy issue $101 million in progress payments if they had no interest in Swiftships completing this task?

MR. GILL: Your Honor, that is a very good question. That is a very good question. But at the end of the day, as we are looking at just normal things, one example that I'll say that we've cited in our brief is 3D modeling. One of the things that happen in a design is the contractor is allowed to do 3D modeling so basically both sides can see what the issues are and see where the problems might exist so they can more efficiently --

THE COURT: And the Navy preferred 2D modeling, at least in first instance. So how is that not the Navy asserting its authority to say, "you know what, I understand you prefer 3D modeling. We want 2D modeling to get a better understanding of what's going on here, and once we are satisfied, you can do 3D modeling"?

MR. GILL: One, it's inefficient, Your Honor.

THE COURT: But inefficiency is not bad faith.

MR. GILL: There has to be a reason for it. There has to be some sort of a reason for why the Navy is doing -- if the Navy's goal is to complete these ships and if the Navy's goal is to get these ships completed as fast as possible, then let the contractor do the design. Let the contractor complete the design, complete the process so the Navy officials can take a look at it and say, no, it's lacking here and it's lacking there.

If you do 2D modeling, all it does is increases the time for when the vessels are going to be complete. You don't catch the design flaws or the issues that are there. It makes no sense. That's fine. Swiftships complied. It's not as if Swiftships said no at any given time. Swiftships kept on doing what the Navy was asking Swiftships to do at all times.

THE COURT: I'm trying to figure out where that line is from disagreement to bad faith. There is a wide gap between those two concepts, and clearly the relationship between the Government and Swiftships deteriorated over time, and perhaps it wasn't great when it started, but that is government contracting. That is any contracting. You are doing a home renovation, yes,

you are reliant upon your design-build contractor to design a home that you might be happy with and then build it once you are happy with it. But it doesn't mean the owner of the home is acting in bad faith because they don't like the blueprints. They want schematics instead.

MR. GILL: Your Honor, I don't think you can take any one factor and say that is bad faith. I think you have to take the totality of circumstances, and we cite ten very specific examples.

THE COURT: Yes, and I'm looking at both, the sum of the parts and the whole in trying to figure out what to do here.

MR. GILL: Yes, sir. Your Honor, it's very clear when you have high-level Naval officials, an admiral coming to Swiftships and saying, "We are going to make sure this contract is cancelled; Swiftships can't do the job," that does not look like somebody who wants to get the work done.

THE COURT: You did not plead that in your complaint. This complaint is 34 pages. It is about 200 paragraphs long, and in none of those paragraphs do you assert that any high-level government official told Swiftships that they were never going to complete this contract, that they were looking to cancel it at any

turn. Your allegations are that the Government officials were badmouthing Swiftships to foreign counterparts, but that is different than threatening this contractor.

MR. GILL: Your Honor, there was one allegation, if the Court may indulge me for one second.

THE COURT: Of course.

MR. GILL: Your Honor, if I may point the Court's attention to paragraph 197 on page 30, example 9.

THE COURT: Okay. I'm there. The paragraph a that talks about the Malaysian Navy?

MR. GILL: Yes, Your Honor. Paragraph 197 says Rear Admiral Anderson, during a 2021 visit, expressed lack of support for Swiftships, explicitly stating his dissatisfaction with the company's facilities.

THE COURT: Yes. I don't like your facilities is not the same as I'm going to do everything in my power to get this contract cancelled, which is what you effectively represented to me was an allegation that you did not make in this complaint.

MR. GILL: Your Honor, Rear Admiral Anderson coming and, we felt, in paragraph 197 expressing dissatisfaction and we felt does show a lack of good faith for the Navy. What do our facilities have to do with -- because we are a small shipyard, I mean, that

right there goes to what we are basically arguing, is because we were a small shipyard, we are not modern, we are not big like Austal, that is why the Navy was basically -- or at least Rear Admiral Anderson did not like Swiftships and wanted to make sure that Swiftships could not complete the contract, and that is one of the allegations that we are making. I concede standing here, Your Honor, I absolutely concede standing here that I could have fully fleshed that paragraph out.

THE COURT: And yet you managed to file a 34-page complaint with -- let me make sure I have this accurate; I don't want to overstate this -- 221 paragraphs, and you want me to interpret all of that into expressed a lack of support.

MR. GILL: Your Honor, there's paragraphs, the take-it-or-leave-it paragraph, there's several paragraphs throughout this complaint that we allege what Mr. Peters said at one point.

THE COURT: Was that to Swiftships or a foreign dignitary or government official?

MR. GILL: I believe that was to Swiftships, Your Honor, but I would have to look at the paragraph. Again, I concede --

THE COURT: I want to look it up because this is important, because you are making representations to the

Court about what's in here, and I didn't read any of that when I read this.

MR. GILL: Yes, sir.

THE COURT: Rule 8 is a low bar, but you must get over it.

MR. GILL: Yes, Your Honor. May I confer with my --

THE COURT: Of course, yes. Please take your time. This is important.

MR. GILL: Your Honor, my apologies to the Court. I did misspeak. It is not in here. But I had Tom Rivers, what I was referring to with Mr. Rivers, and it was not him saying that. It was another matter. So I did misspeak.

THE COURT: I appreciate your candor. I do want to touch on what is and what is not in the complaint, and as the Government points out, in my review of the complaint, nowhere in this complaint does Swiftships directly challenge the termination for default. And I must have read this complaint at least a dozen times looking for that allegation or that charge or that contention, and I didn't see it. And that is stunning to me that of all the tools that the Government has to terminate a contractor for default and perhaps render them debarred at some point time that that would not be

challenged here.

MR. GILL: Your Honor, we believe that we did challenge the termination for default the first time we filed the complaint. It was before that, the Navy had alleged that since the Government had not terminated for default, we would not have jurisdiction to bring this complaint before this Court, which is correct. So we withdrew our complaint. The fact that we filed the complaint and only file after there has been a termination for default, and after you were speaking with the Government's counsel and I was looking through it to see if we did, I don't see those words there.

But we do cite in there that in paragraph 10 -- excuse me, in the example that we were terminated for default. So we believe that even though that is not explicitly stated in here, which is a mistake and oversight on our part, the fact that we have filed this complaint within the time and we could have only been here had there been a termination for default does challenge the termination for default.

THE COURT: So the reference to the termination for default is in paragraph 17 at ECF 1 at page 4, and it specifically states, and I'm quoting the entirety of it: On February 20, 2024, the contracting officer issued a final decision with a letter of termination for

default.

MR. GILL: Yes, your Honor.

THE COURT: That precedes the background facts.

MR. GILL: Yes, Your Honor.

THE COURT: And in no verbiage whatsoever in the prayer for relief do you ask this Court to overturn, reverse, remand or anything to do with a termination for default. You asked me to issue a judgment in favor of your client in excess of $150 million, plus interest and other relief, but no reference to the termination for default.

MR. GILL: That is a mistake, Your Honor, on our part. But again, Your Honor, we do believe that the fact that we filed this complaint after the termination for default does signify that we are challenging the termination for default. Otherwise, why would we have filed this complaint. We could not have filed this complaint as we did before and then withdrew since it was not a final decision.

THE COURT: Since I don't have the benefit of having your certified claim that was submitted to the contracting officer, I only have the contracting officer's decision, there is no reference in the contracting officer's decision addressing the termination for default challenge. Was there a

challenge to the termination for default in the certified claim?

MR. GILL: There was, Your Honor, yes. We had challenged -- Your Honor, we believe procedurally we have done what was required for us to do to be here. Again, it is my sincerest apologies for not having things like that in the complaint. I can't make excuses today.

THE COURT: I have serious concerns whether you waived that ability to challenge the T4D at this time, which would deprive this Court of jurisdiction such that even if I were to allow you to verbally or in writing amend your complaint to now assert it, I don't know that that would stand up if this gets appealed to the Federal Circuit because I must decide the case before me based upon the jurisdiction that I have. And the Government's contention now is I don't have jurisdiction to consider your challenge, to the extent that you have made one, regarding the termination for default. So that is my issue.

MR. GILL: Your Honor, if we may brief that issue, I sincerely believe that just not having the sentence where we are challenging the termination for default, even though we procedurally followed the complaint with the Court of Federal Claims which we are

supposed to do after there is a termination for default, we cite to the termination for default, I believe that a reasonable person could say -- Your Honor could assess from that that we are challenging the termination for default. Otherwise how could we have filed this?

When we filed it before there was a final termination for default, the first thing the Navy did was say we are -- and they did file a motion saying that there has been no termination for default issued, therefore we cannot file this motion before the Court. So then I would argue how could we file this action before this Court if there wasn't a termination for default and if we were not challenging it? If we were not challenging the termination for default, then that would make this entire action moot.

THE COURT: Well, my understanding procedurally of this case is that the original complaint was filed before Judge Hertling or it was assigned to Judge Hertling randomly on March 6, 2024, and that was docket number 24-361. And that was voluntarily dismissed because there was no certified claim filed. And my understanding is that was the basis for the Government's motion to dismiss. You cannot have a CDA claim in this court without a certified claim and an either deemed denial or a denial by the contracting officer. That was

what was being fixed.

MR. GILL: The deemed denial -- Your Honor, we had filed it. There was a deemed denial because the Navy said we are going to deny it, but they did not issue us a formal termination for default. They had not at that time. Therefore, that is when we -- after that is when we filed the claim. They had said they hadn't filed the claim. We got the response and then we filed this claim.

THE COURT: Wait a minute. The timing doesn't work here, because I'm looking at a document that's ECF 1-4 dated 20 February 2024, Notification of Termination For Default, and your complaint was filed weeks later. Your original complaint.

MR. GILL: Correct, Your Honor.

THE COURT: So you are sort of reinventing the timeline as to when you filed this complaint versus the termination for default versus the prior complaint. The order as I see it, and please correct me where I have it wrong, is termination for default, complaint before Judge Hertling, dismissal, certified claim, denial, complaint before me.

MR. GILL: That is correct, Your Honor.

THE COURT: So that is counter to what you just represented as to, well, we have filed this case because

the termination for default had been issued. When we filed the earlier case, the termination for default hadn't been issued. That is not true.

MR. GILL: You are correct, Your Honor. I was referring to when we filed our claim and then that was denied.

THE COURT: Mr. Gill, I need you to be really careful. You can consult with your client as many times as you need, but I don't want to have to keep fact checking you here.

MR. GILL: I apologize, Your Honor.

THE COURT: I also am at a loss as to what exactly you are asking for for this $150 million, because again, I don't have the certified claim and I don't know whether that was detailed in there. As best I can tell from here, you are looking for some measure of lost profits, but the math doesn't work for me. You agreed -- your client agreed to a contract totalling $160 million. Your client was paid $101 million. And now you are asking the Court to award you an additional $150 million.

MR. GILL: So in order to not misspeak, Your Honor, may I consult with my client for one brief second?

THE COURT: Of course.

MR. GILL: Your Honor, $150 million is lost profit, and had the Navy allowed us to do what we were going to do, we would have gotten the full 32 vessels, as was the original contract, and in those full 32 vessels, that would have been our profit.

Now, the $101 million is not just for profit. The $101 million is also for materials, for labor and all that. We are going strictly by what our profit would have been per vessel, and that's what we would have come up with per vessel. The $101 million that we got also went to materials and staff. We are just going by what our profit would have been had we gotten the full 32 boats.

THE COURT: But the contract was for up to 32 boats. Not guaranteed 32 boats. And in every iteration of modifications to the contract, the maximum you were ever going to get was 12 of entitlement that was dropped down to seven at Swiftships' urging because they couldn't complete the 12.

Now, your complaint also notes at page 19, paragraph 122, that your expenses totalled about $130 million and that the Government recovered roughly $4 million in equipment from the job site. And that's at page 32, paragraph 210. I don't understand how you can claim that you would be entitled to all the lost

profits based upon the best-case scenario that your client never achieved.

MR. GILL: Your Honor, the best-case scenario, we believe, since it was up to 32 boats and all the discussions with the Navy it was fairly clear that it was -- once this contract was going forward, we were going to get the 32 boats -- up to 32 boats. That is what we are basing it on. And again, the contract that was subsequently awarded to Austal, I think, has close to that. I don't believe we are off base, at least on that point, thinking that had the seven vessels been built, then we would have gotten the additional vessels and then it would have just kept on going to get to the 32 vessels that the Navy had, you know -- had stated up to the 32 vessels in this contract. So that's where we are getting the number from.

THE COURT: The law is clear not in this circuit that lost profit is not a measure of damages. It's to make the party whole. Not in the best position it could have conceivably been in had everything gone its way, but that is an issue perhaps for another day.

As I understand your complaint, you are not alleging that NAVSEA engaged in illegal conduct or breached an express provision of the contract; is that correct?

MR. GILL: That is correct, Your Honor.

THE COURT: All of your claims are centered on the alleged breach of the implied duty of good faith and fair dealing, as are the coercion and duress based upon those same allegations of the breach of the implied duty of good faith and fair dealing?

MR. GILL: I mean, Your Honor, the coercion, I believe we meet the test. We meet what the case law states in this case. Swiftships literally had no choice. We cite Mr. Yim or Mr. Kim making statements of basically take it or leave it. We show in negotiations, we cite in our examples that we've told the Navy that, look, it's going to cost us additional money because of COVID and because of the changes that are happening to the design, and the Navy basically stated, no, we are not going to give you that. We are going to just -- in the REA we are only going to give you this much. And when we tried to negotiate at any point, we were told, no, sorry, this is it, and if you don't take it, we are going to cancel the contract right here.

So as a small shipbuilder coming out of COVID, what choice did it have? We had no negotiating power. It's not as if we didn't say it and held back and said, "okay, no problem, we'll accept it so that we can say we are standing before you that we've waived those things."

We did everything in our power basically to tell the Navy that this amount of money is not going the resolve the issue and why it's not going to resolve the issue and showed the Navy that. The Navy basically just stated, well, if you want this, take it, or if not, that's it. Take it or leave it. I don't know how we don't meet the definition of coercion. It would have ended the contract right there. Swiftships, again, coming out of COVID would have been basically done for. So we had no choice but to basically accept what the Navy was offering, and that's what we did.

THE COURT: But you could have sued. You could have challenged the termination for default if, in fact, it had been defaulted at that time. You could have sued for breach of contract. So you did have -- Swiftships did have a choice. It just didn't like the options that the Government was offering.

MR. GILL: But Your Honor, with all due respect, in all coercion, there is a choice. It is never that there is no choice. That's why coercion exists. I'll fire you unless you sleep with me, okay. That's a coarse example, but that is coercion. A person had a choice, get fired.

THE COURT: Yes, and that is what the Federal Circuit says time and time again in personnel actions:

If you voluntarily leave the military or voluntarily leave your government employment because under threat of being fired, that was your choice. You could have stayed, been fired and challenged the unlawful firing. That is not coercion according to the Federal Circuit. I have got to listen to what the Federal Circuit says because they make the rules and the law and the precedent that I must follow.

MR. GILL: You are absolutely correct, Your Honor. I believe that it does cite to duress in that circumstance. We can't forget -- I know we are a little bit removed from that right now, but we can't forget at that time what COVID was doing to all businesses, all employment, everywhere, and the shipyard. There's article after article after article in the Navy talking about shipbuilding and how shipbuilding is going down and what the Navy is doing.

So at that time had Swiftships said, "okay, you know what, we are not going to accept the REA as you proposed, Navy. We are going to stop and we are going to sue you," at that time Swiftships would have been done at that time. It had no choice. I mean, to me it's the classic example or what the Federal Circuit says is an involuntary acceptance, and that's exactly what Swiftships did. It made us feel completely clear,

and if this case is allowed to continue to the discovery phase, Your Honor will be more than -- have more than ample evidence to show that Swiftships absolutely did not want to accept, kept arguing against it, however was told time and time and time again take this or leave it. That's it. You have no choice. So to me, under Federal Circuit law, it goes right to the heart of an involuntary acceptance, which is what we did.

THE COURT: I want to circle back to something I asked Ms. Fleming about the timing or the amount of payments at the time of the modification number 41, which was in September of 2022. Ms. Fleming says or represents that progress payments was halted within a few months of that. So how much worse off was Swiftships if they had walked away or allowed themselves to be terminated for default in September of 2022? How much money would they have lost?

MR. GILL: May I confer?

THE COURT: Absolutely.

MR. GILL: Your Honor, at that time Swiftships would have lost approximately $50 million. And the biggest reason for that is there was a lot of material that was on backorder. So as has been going on in other courts, the manufacturers of that material have sued Swiftships for the materials, because as you have

pointed out in the very beginning of this argument, this is not an off-the-shelf ship. This is a ship that we are building, so all the materials basically are specifically designed. So Swiftships had ordered a bunch of materials that were coming in. That was approximately the cost -- that's -- the largest factor in that number is the cost of the materials that had already been ordered at that time.

THE COURT: So let me be clear on this point. So as of September 2022, Swiftships had only received progress payments totalling of roughly $50 million?

MR. GILL: No, Your Honor. I'm saying that Swiftships would have lost that because -- sorry.

THE COURT: Go ahead.

MR. GILL: Swiftships would have lost that because that's what we had backordered. What we were expecting from this REA -- and in a sense all REAs exist because the Government, in some form, feels that they made a mistake, otherwise there wouldn't be an REA.

THE COURT: Well, compromising, giving additional time, giving additional money, giving -- reducing the amount of performance isn't an admission of liability. That is a negotiated settlement, which kind of counters your argument of bad faith if the Government was looking to prop Swiftships up to help it continue performance.

If the Government was acting in bad faith, an argument could be made that they would have just rejected all the REAs and said swim or sink on your own and waited for you to fail and then cancelled the contract. But they didn't do that. They lowered the requirements, increased the per-unit cost or award and at some point extended your deadlines.

MR. GILL: Well, Your Honor, they also stated that we were overprogressed. They were not paying us at that time.

THE COURT: Which you don't contest.

MR. GILL: We contest --

THE COURT: In your complaint there is not one allegation where you assert or otherwise plead that the Government's statement that they overpaid you progress payments was calculated in error, that there was 70 percent of the ships built and 30 percent of the progress payments made. Again, I only have your complaint.

MR. GILL: You are correct, Your Honor, we don't -- we do not contest that. That is what the Government has stated and that is what the Government had. We do not contest that. What we are saying, Your Honor, at that time the REA, there was a lot of materials on backorder. Swiftships wanted to finish

this contract because it knew it was going to get other contracts. It needed the other contracts in order to keep the shipyard alive. So to state that at that time in those circumstances Swiftships could have said, "okay, Navy, if you don't accept what we are saying is going to be the cost of this REA, we want to stop. We want to go file a lawsuit," which takes a significant amount of time and resources, that they could do that. That is what we are saying is the coercion. Navy knew that. Navy knew that they had all the cards and the Navy basically played those cards.

Again, we are stating, and I think we do kind of cite this in our complaint is that whole bad faith and fair dealing is the way the Navy treated us compared to all the other shipyards. We are not the first shipbuilder, Your Honor, nor the first defense contractor standing before your saying, hey, we were late in delivering the times. But the way the Navy treated us is very different than the way the Navy treats everybody else. And the reason we cite the Austal example and why the Austal example is so clear is because Austal also defaulted before and yet they are getting the same contract that's ours. So we do believe it goes to good faith and fair dealing.

I wish I could sit here and point to you some

illegal action. I can't at this time. I can't. But once we get the discovery, who knows. There could be. There were no express contract violations, but our issue is the Navy, from the very beginning, hindered Swiftships from completing these boats. And that's what we wanted to do. It started with the design. It started with basically putting things in our way that we couldn't get the design. It permeated through senior leadership at the Navy, whether our facilities are bad and we did not know what we could do. When we went to the REA, we told the Navy, showed the Navy everything that we needed to get done, and the Navy just basically said, "no, take it or leave it." And the Navy knew that was going to fail so there was no way Swiftships would be able to finish with the amount of money we were getting. We tried. Swiftships gave it a shot and tried, but it did not work.

THE COURT: I want to circle back to the original question I asked because I don't think I got an answer to it. And your representation to me was that in September of 2022, when Swiftships signed the clean release, there was no choice and they were going to lose a lot of money. My question to you was, what were the progress payments of that date?

MR. GILL: The progress payments on that date?

THE COURT: Yes. How much had been paid up through September 2022? Not how much you were going to lose. Not how were you were going to be out. Up to that date, because here is where I'm going with this so you know, you said we couldn't walk away or be terminated at that moment in time because we needed to continue working to get more money. And if you had already received 98 million of the $101 million, you weren't out all that much. And that's why I seized upon the $50 million figure, because I understood from Ms. Fleming's representation that nearly all of the $100 million that Swiftships received in progress payments had been paid by that date.

MR. GILL: May I confer, Your Honor?

THE COURT: Yes.

MR. GILL: Your Honor, you are correct that at that time we had received that much. What we are arguing is the reason we had no choice is because the materials and the costs at that time far exceeded that amount, the contract amount. And the reason it far exceeded it, we believe, is because of the delays that it took. So had we just stopped at that point and had we terminated and had we saw our rights, at that time Swiftships would have been out a considerable amount of money. And that's where I got to $50 million number

from. That's what we would have been out.

Now, even though that is not what was originally contracted for, the materials far exceeded what we thought they were going to do. Again, I apologize to keep harping on this, but I don't want the Court to lose sight of this fact. There was a very big event that intervened the middle, which was COVID, which increased the costs for not just us but for just about everybody in there. That's where I'm getting the additional figure from is that's what we were doing with the REA.

And again, the reason an REA exists, and I can't cite you the FAR code, but there is some form of government liability. Otherwise if there isn't, we would have filed an 8504. But the REA existed, and what we are arguing is not that we hadn't received all of the money in the contract. What we are arguing is that the materials and the staffing that it took to build the ships at that time, there are many reasons, the biggest factor being the Navy's interference and their constant trying to prevent us from completing the design and completing the vessels is what caused the additional costs. That's why we were trying to get the REA adjustments so we could get back on track and finish. So the 50 million that I'm citing to you, Your Honor, is the materials that we had ordered and that we had

backordered. That's a large part of where that is. So Swiftships would have been liable for all that had we just ended the contract right there.

THE COURT: And did Swiftships receive that $50 million?

MR. GILL: Swiftships received -- I think under the REA they did receive, I believe it was, 41.

THE COURT: I want to circle back and go through the examples that you cite to make sure I have a good understanding of them. We've largely exhausted example number 1, which is the design, but I want to talk about the preliminary design and the allegation that Swiftships is now claiming that they were incomplete. And I want you to address Ms. Fleming's point that you had the preliminary designs at the time the solicitation was issued, so if there was something wrong, it should have been noted at that moment and not as an excuse as to why you couldn't finish the work.

MR. GILL: May I confer real quick, Your Honor?

THE COURT: Of course.

MR. GILL: Your Honor, everybody knew that the designs were incomplete at the time, and the process that we were going to go through with our process, with our designs, we felt were going to complete the design. That's why we didn't speak out at that time because we

felt that our design process and the process that we have would have completed the designs. However, in the -- as we went along, the Navy kept on changing some of the terms of the designs. That's why we didn't speak up. We were pointing out the designs were preliminary and incomplete, but I don't think at that time that was not an issue. It became an issue later on. We knew it was an incomplete design at that time.

THE COURT: And you would agree with the Government, I assume, that the letter of concern is not required under the terms of the contract?

MR. GILL: Correct.

THE COURT: And it seems to be a benefit of, a precursor to a notice to cure.

MR. GILL: Yes, Your Honor.

THE COURT: So how is it bad faith? Because you cite it as an example of retaliation and bad faith that they would issue a letter of concern. It's affording you more due process than you were otherwise due or more process than you were otherwise due.

MR. GILL: Your Honor, what we are challenging is the fact that the letter of concern had to be issued in the first place. We were shocked by the letter of concern since we were working with the Navy going back and forth on these issues. So for the Navy at that

point to issue a letter of concern, they knew exactly why Swiftships was where it was since we were talking not even on a daily basis, multiple times on a daily basis. So when we got the letter of concern, we were very surprised by that letter of concern.

THE COURT: So help me understand because I keep coming back to this, but Swiftships was paid $101 million. Then there's this notification which I now learn awarded Swiftships an additional $41 million. So at this moment in time you have been paid $142 million. You have delivered nothing, and you are surprised that they are expressing concerns that this contract, which is now four years in, pandemic aside, has produced nothing to the tune of almost $150 million and you are surprised?

MR. GILL: Your Honor, we were surprised because the Navy has prevented us from doing that. We didn't want to be in default.

THE COURT: Did the Navy cause the pandemic?

MR. GILL: No, sir, but we didn't either.

THE COURT: You are saying, This pandemic happened; Navy, you are responsible for any damages as a result of it.

MR. GILL: Your Honor, we are not saying the Navy is responsible, but we are saying that there has to be a

realization that the prices that everybody quoted and submitted in their bids changed during the pandemic.

THE COURT: And that's modification 41. You asked for $50 million. You got $41 million.

MR. GILL: No, Your Honor. We asked for $79 million. We got $41 million. So we did ask for more in order to complete the designs or complete the vessels. That's what Swiftships wanted to do is complete the vessels, and we did not get what we were asking for. Not because we were asking that for that because we wanted to make a profit at that time. At that time we would not have made a profit even on that $79 million.

What we were asking for was a chance to complete the vessels, to complete the designs. And the Pentagon itself -- and I will find this paragraph we did cite to. The Pentagon itself had written -- there was a memo out there that talked about the escalating material costs during the pandemic for designs, which we cited to. So it's not that we are asking for profit. It's not, I agree, sitting here and saying, hey, you have got $141 million and you delivered nothing. How can you be surprised the Navy is upset? The issue there --

THE COURT: Not necessarily upset. They are asking questions: Are you going to do this? How are you

going to do this?

I'm having real difficulty connecting their asking questions with you alleging that those questions are bad faith.

MR. GILL: Your Honor, because they were asking the questions and they knew the answers --

THE COURT: But they need to document those questions and those answers. Otherwise you would be standing before me saying they terminated us for default without any warning whatsoever; there's nothing in the record to show us that they were concerned at all.

MR. GILL: Your Honor, we also challenge, and I think we do in this is challenge the Navy's actual concerns that were listed there in the letter of concern. Again, I wish I would have attached more exhibits to this complaint, and that is a hundred percent my fault, so Your Honor would have the benefit of the letter of concern and all the other exhibits that go along with it.

When you prevent someone from actually doing the work and then you are shocked that that person or that contractor does not do the work, we do believe that is bad faith. You know why the contractor -- NAVSEA is not made of inexperienced individuals. They are experienced individuals who know how to build ships and know what is

required in building ships. However, that's why we were surprised at how they dealt with Swiftships in this contract. And again, the reason we are surprised, Your Honor, is because we have dealt with NAVSEA on numerous other contracts and the experience has not been the same. The experience has been very, very different, and we have -- Swiftships has completed many boats for the United States Government for NAVSEA. Swiftships completed quite a few boats for the Iraqi Navy so the U.S. Navy could exit.

THE COURT: But doesn't that undermine your allegation that NAVSEA was out to get Swiftships if, in every other circumstance, things went along smoothly, everything worked out? In this case Swiftships fell behind. They were being paid way more than they were delivering. NAVSEA expressed concerns. They didn't like the answers they received or the confidence that Swiftships was exhibiting and the proposal that Swiftships proposed of, well, we can finish the job by X date. And that was unsatisfactory to NAVSEA and at that point, they said, you know what, we are done.

MR. GILL: We believe that that goes exactly to our argument because we have dealt with the Navy and we know how the Navy is not dealing with you in bad faith, how the Navy deals with you and how NAVSEA deals with

you because we've experienced it on numerous occasions. So on this particular contract, and as you know, NAVSEA is personalities, right. One person is here today, another person is gone tomorrow, folks are here. That is why we were surprised at the treatment we were getting during this contract, and that's why we are alleging that there is something -- there was bad faith going on. We believe, and we allege that here, is that they did not want us to have the contract, and the plan was always to give Austal the contract and find a legal way that basically would go down that road, which is what we believe, and we believe we did allege it here. That's why we basically are -- I'm standing before you saying we know there was bad faith because the other contracts have gone smooth.

In other contracts, it's not that Swiftships hasn't fallen behind. Sometimes it falls behind for various reasons, design delays, materials, deliveries, many factors that cause contractors to fall behind on building a weapons system, but the way the Navy treats you and the way Navy deals with you when they are dealing in good faith and want to just get the product or the vessels completed are very different than the way the Navy treated Swiftships here knowing why the material costs are going up.

I think that's -- maybe we have not made that clear. The Navy knew exactly everything that was going on. We did not hide it. We did not -- It's not like something that Swiftships did that was wrong. We didn't take the money, spend it elsewhere. Everything was going to the program that it was supposed to go to. But the costs just went up. I mean, that's the simplest way of putting it. The costs of the contract went up. It's not our fault. It's not the Navy's fault, but it is still a circumstance. It still exists in that case.

And the Navy and every other shipbuilder, again, Your Honor, a lot of new stories out there about shipbuilders, weapons designs, F35, whatever program you want, the Navy and the Government deals with those defense contractors in a very different way, giving them a lot more money, even covering their profits, than they dealt with Swiftships. That's what we are alleging.

THE COURT: Well, there would be a lot of plaintiff counsels that stood at that podium arguing differently before me in other cases, but I take your point.

MR. GILL: Again, Your Honor, just the Austal contract, and that's why we mentioned that in our -- to us the clearest example of bad faith is the materials went up. And Austal, the per-unit price for each boat

is higher than it ever was with us. Austal is a contractor that at one point, I believe, was disbarred or close to it, had been terminated for default, yet they got the contract back. We believe that the Navy wanted to give that contract to that shipbuilder from the very beginning, and that's what happened. Nowhere did the Navy allege Swiftships misappropriated the funds, Swiftships took the funds, spent it somewhere else, pocketed the money, did anything other than build the vessel and worked to build the vessel.

What Swiftships is alleging is because of the pandemic and because of the design delays and the changes, not just the design delays, the changes over and over again, that increased the costs quite a bit. And what we needed to do was to kind of fix it.

In the REA -- again, Your Honor, if you allow supplemental briefing, I will absolutely put that in there, but the FAR basically talks about REA and REAs usually are used when there is -- I'm not saying an admission but thee is some sort of fault on the government's part. Otherwise it would be under a different format.

And even in the REA, when Swiftships kept trying to say, "look, forget about our profit. Here is how much we've got. Here is how much we need to complete

the vessel," if the Navy's goal was to complete the vessels, here are vessels that are X amount percentage complete. Let us have the money to go directly to the vessel. And the Navy was monitoring it and the Navy at that time had a controlled disbursement account so there was no issue with where the money was going to go. Let us complete the vessels so then we can just continue to move forward so they can get what they wanted. That is what Swiftships is alleging. And that fact that that did not happen, that is what we are alleging is bad faith, and that's why we cite these examples.

THE COURT: Along those lines, walk me through the CPARS example with the premature closing of the portal.

MR. GILL: Your Honor, may I?

THE COURT: Of course.

MR. GILL: I don't want to misstate anything.

Your Honor, the CPARS, they did close the portal, and we had time to respond. We were responding on the last day that we were responding and we wanted to make sure we had a complete response to them. When we tried, they closed -- the portal was closed, so we could not upload our response. We contacted the Navy and we, you know, asked the Navy, it's closed. And after some negotiation, some back-and-forth, the Navy did agree

begrudgingly to open it for one more day so that we could actually upload it.

THE COURT: So I want to unpack that a little bit. So negative CPARS, you are given 30 days to respond. On day 30 you try to respond and the portal was closed. Do you have any idea when that portal closed?

MR. GILL: We believe it closed the day before.

THE COURT: So a 24-hour discrepancy. And Swiftships reached out to the Navy and said, "Why is this closed? We haven't responded and we want to respond." And within 24, 48 hours, three months, how long did it take for Swiftships' response to the CPARS to get loaded on to the system?

MR. GILL: It took about 48 hours, Your Honor. Forty-eight hours or 72 hours. Two, three days, max.

THE COURT: Okay. Was there a reason given by the Navy?

MR. GILL: No. That's why I specifically asked did the Navy give a reason. They just said they did not. It wasn't as if the Navy said, "sorry, we closed it accidentally." The Navy said, "well, it's closed. You missed the deadline." We said, "no, we didn't miss the deadline." Our deadline was this, and we wanted to file it. We were ready to file but the portal was

closed. And then I think they went and verified that the portal closed that day, and that's when we were allowed to file.

THE COURT: So in example 5, this is where I struggle with the allegations of bad faith given that Swiftships may not agree with the decisions made by the Navy, but the Navy issued CPARS, issued a show cause notice, denied further delay extensions, terminated for default, engaged in settlement negotiations, addressed or allowed for you to file a certified claim and then issued a decision or a notice that an additional 31 days was required to issue a decision on the certified claim and then met that deadline.

So I look at that, again, in a vacuum, and I see process, process, process, process, process, all called for by the contract and provided for in the contract. The only thing that's not in here is that letter of concern which you weren't entitled to but yet they gave it to you anyway as a prelim to the cure notice. And so how does that equate to bad faith?

Now, in a typical bad faith argument, the Navy would come right out of the box hot and say, "You know what, default, done." That is bad faith or likely bad faith. I shouldn't speak in absolutes. Here the Navy used every tool in its toolbox to prod performance

along. Now, you may disagree and you may say the pandemic caused all these delays; the Navy's designs were not worthy of a ship and we had to make them and then they delayed. You may disagree with all of that, but this is all the process you were entitled to. So I don't understand how example 5 becomes an example of bad faith.

Now, I understand your argument that is a pattern and practice and this is one issue. But again, I'm looking at each of the sums, each of the parts and the sum of the whole, and I'm not just going to look at the entire treasure-trove of examples. I'm going to look at each one and say does each one represent bad faith. And if zero, five or all ten are each examples of bad faith, that may or may not help you. And then I will look at the whole and does this whole constitute bad faith. So the exercise we are going through now is each example, and I don't see how example 5 is bad faith.

MR. GILL: Your Honor, if I may point to on example 5, paragraph 129, also on page 21.

THE COURT: I am there.

MR. GILL: I mean, it goes from paragraph 128, but again, paragraph 129 right there is just one small example of the Navy going against its own guidance.

THE COURT: Well, is this the Viega MegaPress

fittings?

MR. GILL: Yes, Your Honor.

THE COURT: The Navy initially said it's not going to pass the shock test or the stress test. And then they did more analysis and they're like, you know what, it is going to pass, so it's okay. I get that that cost a little bit of time. But how is that bad faith to do due diligence on the thought process of is this going to work, can it work, should it work, must it work?

MR. GILL: Your Honor, the issue is that at every single time, we had to basically prove it to the Navy, we had to -- I don't want to say it like this, but I can't think of another way to say it -- almost catch the Navy, basically, in what they were doing wrong and basically show them, look, this does work. Again, this is one example. The Navy had guidance on this issue completely, and they said, no, it's not going to meet the test. We knew it would meet the test, and then they finally go back and once we actually pointed it out to them and actually forced them to look at the issue again, then they said, yes, it does pass the shock test.

THE COURT: But these are not widgets going to be used in some factory. These are ships that are going to carry the men and women of our armed services. So how

is engaging in a due diligence process amount to bad faith? Now, you said this is one example, but this long complaint is not littered with a number of examples. You talk about the design -- the preliminary designs, which you knew walking in the door what those designs were. Now this, I'll give you credit on this Viega thing, but you also don't state how long this took, whether this was a yearlong process of review or whether this took a week or a month.

MR. GILL: The Viega, again, was approved in June '24, the next paragraph. It did take a while. That's correct, Your Honor.

Our point is I wish I had -- bad faith, Judge, comes in many forms. I wish there was -- I think at this stage, at least, at this stage I might not survive a motion for summary judgment, but I do believe at this stage I have alleged enough in the complaint to survive the motion to dismiss.

Now, when we go to the discovery phase and we see going to paragraph 129 as an example, the Viega MegaPress phase, is it as Your Honor has pointed out, that the Navy basically is asking questions and saying, hey, well, let me do due diligence, let me see if there is something there, ask additional tests. As a former Navy member serving on a ship, I do appreciate the Navy

taking all of these precautions. Is it that or is it something else? I mean, if it's as Your Honor has cited, then you are right, there is no bad faith. But if it is something, if there's an e-mail out there or if there's something out there the Navy is not looking at that, that the Navy knew from the very beginning this does pass the shock test and it's fine but we are going to ding Swiftships on this anyway, then I do believe that is bad faith. The question is, which way is it? Is it just asking additional questions and making sure they are doing a complete due diligence to make sure they get a very good ship that is seaworthy and can make sure to keep our men and women safe and engage in warfare? If that's correct, that's what the Navy is supposed to be doing. Or is it what we believe it is, that the Navy is just basically trying to ding Swiftships on something else and then Swiftships catching them and saying, no, it does meet the shock test? If it's the latter, then I do believe that is bad faith. But at this stage, without the benefit of discovery, without the benefit of e-mails, without the benefit of memos, neither you or I know which category this falls under.

THE COURT: I asked Ms. Fleming this at the outset. How do I balance your allegations of let's

assume it's bad faith until I get going on a discovery -- engage in discovery, versus the presumption of regularity and good faith?

MR. GILL: Your Honor, we believe that we have alleged enough facts in here that it, at least for this phase, just this phase does make it look like, if you believed everything that is written in here, which at this stage the Federal Circuit requires you to --

THE COURT: Not the legal issues.

MR. GILL: Correct, Your Honor. The factual claims, if you believe the factual claims at this stage, if the factual claims that we have stated is clear, then we believe the Navy engaged in bad faith. Now, whether I'll be able to prove that or not is a different question. That's a question for a different day. But at least at this date, I don't believe this complaint is that devoid that basically if you take everything that's written here as the truth that it does -- still does not amount to bad faith. I do believe that if you take everything taken in this complaint, that certainly amounts to bad faith, in our view.

THE COURT: And walk me through your understanding of how, in example 10, the recovery of property constitutes bad faith.

MR. GILL: It was property that Swiftships had

paid for. In fact, several pieces of that property Swiftships is being sued for for paying. So the Navy, just walking into our shipyard while we are engaged in these negotiations, saying we are just going to take this property that Swiftships has either paid for or worst-case scenario has not paid for but is obligated to pay for so now we can't even return that, we believe that is bad faith.

THE COURT: And how does the eviction notice come into play here?

MR. GILL: I mean, the eviction notice was a circumstance -- I don't believe the eviction notice comes into play, because Swiftships -- and I pointed that out to counsel. Swiftships, at that time, was making arrangements to either stay there for a little bit longer or remove all of its property to one of its other shipyards. The reason Swiftships got an eviction notice is exactly what we are alleging in this complaint. The Navy took the money away, prevented Swiftships from getting other contracts. Swiftships had no money.

THE COURT: So the $4 million in property that was on the site that you claim the Navy took, that wasn't part of the $141 million they paid you for?

MR. GILL: They paid us for it, Your Honor. So

that property, we believe -- some of it was not, because remember I told you there was materials that were backordered. I would have to go and do an actual inventory, which I believe I did send Navy counsel actual inventory of the supplies that had not already been paid for. We had backorders of supplies. Supplies came in. They were on the shipyard, and some of them the Navy had paid us for it and they were our supplies. So the issue was there were some supplies that were not the Navy's supplies, were Swiftships's supplies, and there were some supplies that Swiftships had not paid for already but had obligated for and had been delivered during the time that this litigation was going on. In fact, I know two materials that were -- that we have been sued for in Louisiana because we can't return the supplies and do that. We believe that is absolutely bad faith, and there was no reason for the Navy to go in there and grab the materials.

THE COURT: Anything else before I hear from Ms. Fleming again?

MR. GILL: No, Your Honor. Thank you.

THE COURT: Thank you, counsel.

MS. FLEMING: Your Honor, may I briefly confer with Mr. Gill before I return on my rebuttal?

THE COURT: Of course, yes.

MS. FLEMING: Thank you, Your Honor. If I may, the parties have jointly agreed to proffer a copy of the certified claim. Unfortunately, I only have one copy with me today.

THE COURT: I can make a copy if you want to give it to my clerk.

MS. FLEMING: Thank you.

THE COURT: Mr. Gill, you are okay and you have seen the document that she is handing to the Court?

MR. GILL: Yes, Your Honor.

THE COURT: If you'll indulge me for just two minutes. Thank you, counsel.

MS. FLEMING: And I just want to make two points regarding that claim, Your Honor, that are relevant to some of the questions you asked of Mr. Gill. First of all, my reading of their certified claim does not challenge the T4D at all. So we would disagree that they raised that on the challenge, and the Government's position is that they have now lost their opportunity to do so given the tolling of the statute that gives them 12 months to challenge the T4D.

Second, you asked Mr. Gill several questions about how he arrived at the request for relief, specifically the amount of relief that he sought. And the claim goes into some detail about that on page 4.

He explains that of the approximately $150 million, 100 million is predicated on the anticipated construction of 32 vessels, which as Your Honor pointed out, is not guaranteed under the contract at the constructed rate established by Austral. Not on any analysis of -- internal analysis of what profits that Swiftships expected to achieve, but on their own analysis of another competitor's contract that, again, was awarded under different circumstances and at a different time than their own.

And finally, they included in their total $150 million amount $27 million in lost profits from this contract with Malaysia that they allege they lost because of something that the Government said. But to that end, it's not merely that they are seeking lost profits, but they are seeking profits based on their guess about somebody else's profits and their assumptions about how another contractor was or was not awarded.

In addition to the few brief points to follow up on, Mr. Gill referenced the take-it-or-leave-it language. He referenced it on several occasions to explain bad faith on behalf of the Government. That language in their complaint was only mentioned in conjunction with the September 2022 modification, that

is the Government allegedly told Swiftships that it could take or leave the $41 million offer to resolve its REAs. That is not the same, as Mr. Gill suggests, as having no choice, because of course, the Government didn't say, "We are going to cancel your contract; we are going to stop paying you other moneys due under the contract." The Government is saying, "You have asked for 70 to $80 million. We are willing to give you 41, and you can accept that now or you can challenge the REA," which Swiftships elected not to do. So they did, again, have a choice.

They also referred to the Pentagon memo as a basis for why they should have secured all $79 million of their requested money because, as they point out, the Pentagon memo did suggest that in federal contracts the federal contract -- those contracting officers have the authority the mitigate expenses resulting from the cost of the pandemic. But that was giving them the authority to do so if they wished, if they thought it was appropriate. And it wasn't to give them whatever was asked of them, but instead to consider mitigating costs that arose under the pandemic, which is, of course, not the same thing.

Otherwise, I don't have anything to present, but I'm happy to answer further questions if the Court has

them.

THE COURT: Thank you, counsel. I don't have any further questions. We will make a copy of this and get the original back to you.

MS. FLEMING: Thank you, Your Honor.

MR. GILL: Your Honor, may I just make one final point?

THE COURT: Yes.

MR. GILL: Real quickly, Your Honor, I just want to point out on the REA, one of the other issues we are citing to is the memo that I cited to was from the REA adjustment from the 79 million to 41 million, what the Navy did not adjust for the difference of that is for material escalations, adjustments for material escalation and the consolidated contract. So on one hand in the REA, the Navy is basically saying we are not going to adjust for materials, and on the other hand, we are receiving a memo from Mr. Tenaglia acknowledging the circumstances for accommodations. And it's cited in paragraph 98 of our complaint talking about impacts of small businesses and other suppliers and asking that there can be escalations for material. So we were left with thinking, okay, if there can be escalations and if we have proven to you that the material costs were escalated here beyond what it was before COVID, then why

not allow us money for that. So that is another factor that we are pointing out in bad faith in the REA negotiation because specifically what did they not give was for material escalation.

THE COURT: Let me ask you this. You used a word that caught my ear, which is "can." They can accommodate these cost increases. Some would argue that they should. But your standard is not only that they must or the standard that you must reach is that they must accommodate that but that it was bad faith not to do that. And so I'm looking at this case through the level of review that I must scrutinize it. I am not sitting at the Navy's desk making these decisions anew saying, "Oh, my goodness, we have to have these boats. Let's just throw more money at the problem. Let's throw more time at the problem. This contractor is on board. We think they are making decent process. Let's go forward." That is not the way I have to look at this. I have to look at it from the viewpoint of what happened here as best as I can surmise and whether or not your allegations, which all focus on an extraordinarily difficult and narrow legal standard of alleging bad faith on behalf of the United States Navy in dealing with this contract.

MR. GILL: So once again, Your Honor, back to my

earlier example, if the Navy stated that Swiftships should not -- did not qualify for this accommodation that Mr. Tenaglia had put forth in his memo for some legitimate reason, then you are absolutely correct. The Navy looked at it, they can do it, there's not a "must" standard and they said, "no, sorry, you don't meet the standard for whatever we set forth."

But on the other hand, if the Navy basically said, "yeah, we know we can do it. We are going to do it for nine out of ten contractors, the one contractor we are not going to do it for, Swiftships," then I would say that is bad faith, and that's my point in this whole complaint. We don't know why the Navy did not do that.

What we believe we know and we believe the evidence will bear that out, if the Navy had given -- and in some worse circumstances than us, right, some shipbuilders or not even shipbuilders, defense contractors who are further behind or have taken more money or whatever have you, and even in those cases the Navy says, "yes, we are going to follow this memo and we are going to basically allow an escalation for -- or allow an accommodation for escalating material costs," that's one thing and just not Swiftships, then that is bad faith. So the reason behind why they didn't do something that they put forth, that, I believe, is at

the heart of whether what the Navy did is legitimate and just the Navy doing what the Navy is doing, which, again, I can't speak for or the Navy treating Swiftships in bad faith.

THE COURT: Thank you, counsel. Mr. Gill, if you can take this original back and a copy for you of the certified claim, you may approach and give the original back to Ms. Fleming. Take the copy for yourself so you know exactly -- you have a record of exactly what was given to the Court. The Court has kept a copy.

I started this morning by expressing my concerns about the briefing. That has been more than made up for for the advocacy today. I think both counsel were amply prepared and answered all of my questions to my satisfaction. So I thank you for that. But I am prepared to rule on the pending motion from the bench. And so everyone is aware, I will issue an order simply adopting today's bench ruling, and if there is an appeal of this ruling at any point in time, the transcript will serve as the formal written opinion of the Court.

As stated at the outset of today's hearing, pending before the Court is Defendant's motion to dismiss at ECF number 7. In resolving Defendant's motion to dismiss, the facts are largely drawn from Plaintiff's complaint and attached exhibits

corroborating agency proceedings appended to Defendant's dispositive motion but referenced in Plaintiff's complaint and undisputed publicly available information. See Dimare Fresh Inc. versus United States, 808 F.3d 1301 at 1306 (Fed. Circ. 2015), which represents the following: In evaluating a complaint for sufficiency under Rule 12(b)(6), the Court is not limited to the four corners of the complaint. The Court may also look to matters incorporated by reference or integral to the claim, items subject to judicial notice and matters of public record.

Established in 1942 and headquartered in South Louisiana, Swiftships is a small business engaged in the design and construction of sea crafts for military and commercial users. In February 2017, the United States Navy Sea Systems Command, NAVSEA, N-A-V-S-E-A, issued a small business set-aside competitive solicitation for the design or detailed design and construction of landing craft utility, LCU, 1,700 class vessels as part of the military's effort to modernize its amphibious and pre-positioning forces. The solicitation called for the delivery of up to 32 vessels between 2022 and 2027.

On March 30, 2018, NAVSEA awarded a contract to Swiftships for the design, construction and delivery of one LCU by July 28, 2020. In successive years, NAVSEA

modified the contract several times to add an additional 11 vessels, increasing the total price of the contract from just over $18 million to over $180 million.

In early 2020, the COVID-19 pandemic and related economic disruptions caused increases in material prices and supply shortages and delays, reportedly hampering Swiftships' contract performance. In response, Swiftships submitted requests for equitable adjustment, REAs. Following negotiations on September 27, 2022, NAVSEA issued contract modification 41, reducing the number of deliverables to seven vessels from 12 and adjusting the contract price to nearly $160 million down from $180 million. In exchange, Swiftships executed a clean release of all claims accruing on or before September 1, 2022.

Notwithstanding the scale back of deliverables and increased unit price, Swiftships struggled to meet contract deadlines. Expected delivery of the first LCU slipped to June 30, 2023, with follow-on deadlines of September 29th and December 29, 2023, for the second and third vessels. When Swiftships requested an additional extension and supplemental funding, the contracting officer denied both, explaining that the contract was nearly $10 million in overpayment status. Having already paid Swiftships over $140 million, including the

$41 million in modification 41, NAVSEA suspended further progress payments.

After Swiftships missed the June 20, 2023, delivery deadline, NAVSEA issued a show cause notice. The contractor's failure to meet the delivery deadline for the second vessel three months later prompted an invitation by NAVSEA to engage in settlement negotiations in lieu of termination for default. Efforts to resolve this matter failed, resulting in the February 20, 2024, default termination.

Following the T4D, Swiftships initially filed suit in this court on March 6, 2024. See Swiftships, LLC versus United States, docket number 24-361 Federal Claims. That matter was pending before Judge Hertling. It was voluntarily dismissed three months later to facilitate the filing of a certified claim.

A final decision denying Swiftships' administrative claim issued on September 5, 2024. Through this action, filed on October 15, 2024, Swiftships pleads one count, breach of the implied duty of good faith and fair dealing. Swiftships seeks $150 million in damages, plus interests, costs and other relief.

To avoid dismissal for failure to state a claim under Rule 12(b)(6) a complaint must allege facts

plausibly suggesting, not merely consistent with, a showing of entitlement to relief, Kam-Almaz versus United States, 682 F.3d 1364 at 1367 (Fed. Circ. 2012.) A Plaintiff must plead factual content that allows the Court to draw the reasonable inference that the Defendant is liable for the misconduct alleged, Ashcroft versus Iqbal, 556 U.S. 662 at 678, 2009. At the same time, a Court is not bound to accept as true a legal conclusion couched as a factual allegation, Kam-Almaz, 682 F.3d at 1368.

In evaluating Swiftships' claims, moreover, the Court must presume that NAVSEA officials discharged their duties in good faith and presumed regularity. Road & Highway Builders, LLC versus United States, 702 F.3d 1365 at 1368 (Fed. Circ. 2012), collecting cases. Rebuttal of this presumption carries a high burden. AM-PRO Protective Agency versus United States, 281 F.3d 1234 at 1239 through 40 (Fed. Circ. 2002.)

Duress occurs when a party involuntarily accepts another party's terms because the circumstances permitted no alternative and such circumstances were the result of the other party's coercive acts. TPMC Energy Solutions Environmental Services 2008, LLC versus United States, 176 Fed. Cl. 56 at 159 (2025), quoting Pew Forest Products versus United States, 105 Fed. Cl. 59 at

67 (2012), citing North Star Steel Company versus United States, 477 F.3d 1324 at 1334 (Fed. Circ. 2007.)

To establish a viable claim of coercion or duress, Swiftships must demonstrate that, one, the contractor involuntarily accepted NAVSEA's terms; two, the situation permitted no other alternative; and three, the circumstances were the result of NAVSEA's coercive acts. Dureiko versus United States, 209 F.3d 1345 at 1358 (Fed. Circ. 2000), citing Employers Insurance of Wausau versus United States, 764 F.2d 1572 at 1576 (Fed. Circ. 1985.)

As with the breach of the implied duty of good faith and fair dealing, the party claiming coercion or duress bears a high burden. TPMC Energy, 176 Fed. Cl. at 159 through 60. Put simply, signing under protest is not the same as establishing the required elements.

Relevant here, economic pressure and even the threat of considerable financial loss are not duress, again, citing TPMC Energy at page 160, quoting Johnson, Drake & Piper, Inc. versus United States, 531 F.2d 1037 at 1042 through 43, Court of Claims 1976.

Exceptions to these general principles require wrongful conduct by the Government, defined as actions that are illegal, a breach of an express provision of the contract without a good faith belief that the action

was permissible under the contract, or a breach of the implied covenant of good faith and fair dealing. Because Swiftships does not allege that NAVSEA engaged in illegal conduct or breached an express provision of the contract, all roads lead back to Swiftships' claims that NAVSEA breached the implied duty of good faith and fair dealing.

To establish a breach of the implied duty of good faith and fair dealing, Swiftships must show that NAVSEA officials interfered with the contractor's performance or acted to destroy the contractor's reasonable expectations of the benefit of the contract. See Bell/Heery versus United States, 739 F.3d 1324 at 1335 (Fed. Circ. 2014), citing Centex Corp. versus the United States, 395 F.3d 1283 at 1304, (Fed. Cir. 2005.)

The duty is not a catchall contract claim that will apply to ordinary disagreements otherwise not covered by other provisions of the contract. Instead, the implied duty of good faith and fair dealing is limited by the original bargain. It prevents a party's acts or omissions that, although not prescribed by the contract expressly, are inconsistent with the contract's purpose and deprive the other party of the contemplated value. Metcalf Construction Company versus the United States, 742 F.3d 984 at 991 (Fed. Cir. 2014), citing

First Nationwide Bank versus United States, 431 F.3d 1342 at 1350 (Fed. Circ. 2005.)

To be sure, breach of an implied duty of good faith and fair dealing does not require a violation of an express provision of the contract, but a specific promise must be undermined for the implied duty to be violated. Dobyns versus United States, 915 F.3d 733 at 739 (Fed. Circ. 2019), quoting Metcalf Construction, 742 F.3d at 991. Thus, what the duty of good faith and fair dealing requires depends, in part, on what the contract promises or disclaims. Precision Pine & Timber, Inc. versus United States, 596 F.3d 817 at 830 (Fed. Circ. 2010.)

It is clear even from the limited record presented to this Court that there was a fair amount of discord between NAVSEA and Swiftships. However, the question is not whether there was a pleasant working relationship but rather whether the disagreements rose beyond those reasonably expected during contract management and performance, which are not actionable, and the hollow allegations that NAVSEA officials sought to undermine the contract and cause Swiftships to fail. Any alleged undermining must be related to the terms of the contract, as what the duty entails depends, in part, upon what the contract promises, requires or disclaims.

Metcalf Construction Company, Inc. versus United States, 742 F.3d at 984 at 991 (Fed. Circ. 2014.)

For this reason, examples 6, 7 and 9 of Swiftships' complaint fail to show a breach of the implied duty of good faith and fair dealing. None of the alleged misbehavior by NAVSEA officials regarding negative comments reportedly made to their foreign government counterparts relates to the contract at issue in this case, the detailed design and construction of LCU vessels for the United States Navy. At best, Swiftships' allegations sound in tort, defamation or libel or tortious interference with a third-party contract. Such claims are clearly outside this Court's Tucker Act jurisdiction.

Example 8, in turn, relates to the agency's alleged preferential treatment in propping up a Swiftships competitor. Even if true, the claim might be material in a bid protest but not in this Contract Disputes Act claim centered on Swiftships' failure to perform and deliver. Put simply, none of the behavior in these four examples is inconsistent with one party, NAVSEA, deciding that the other party, Swiftships, is not meeting its standards and consequently pivoting towards viable alternatives and sharing NAVSEA's experience with their foreign government counterparts.

As pled in the complaint and briefed and argued here today, Swiftships' claims in this regard are not plausible on their face, let alone when measured against the presumptions of regularity and good faith that this Court must apply. Acceptance Insurance Companies versus United States, 583 F.3d 849 at 853 (Fed. Circ. 2009) quoting Bell Atlantic Corporation versus Twombly, 550 U.S. 544 at 557 (2007).

Examples 3 through 5 and 10 fare no better. It remains unclear which facts in example 3 are supposed to constitute a breach of the duty of good faith and fair dealing. Sending a letter of concern is a gesture not required by the FAR that gives contractors time to remedy any problems before a show-cause letter. The contested CPARS rating, in turn, presents as an accurate record of NAVSEA's impression of Swiftships' performance to date.

In the end, Swiftships received over $141 million in progress payments and adjustments on a $160 million contract and delivered exactly zero LCU vessels. The closure of the CPARS portal 24 to 48 hours prior to Swiftships' noticed response time was more plausibly caused by miscommunication or careless error than an orchestrated bad faith, let alone a pattern of bad faith. The fact that NAVSEA remedied the situation by

allowing Swiftships to submit its response within 48 hours underscores the Court's finding in this regard.

NAVSEA's cited conduct in example 4 similarly follows the protocols of government contracting and is not evidence of bad faith. The contract connects payments to physical progress in constructing the LCU vessels based upon the percentage completion of the vessel. It is certainly possible and indeed the simplest and most reasonable explanation that the decision to suspend progress payments was directly linked to the documented conclusion that progress payments to date far exceeded contract performance, a matter that Swiftships does not contest or otherwise allege and in fact, conceded today.

Again, at the end of the day, NAVSEA paid Swiftships over $140 million on a $160 million contract for the design, construction and delivery of seven vessels, and Swiftships delivered nothing. In fact, according to the complaint, NAVSEA recovered only $4 million worth of equipment from the job site post termination.

Example 5 is similarly devoid of the required evidence of bad faith by NAVSEA. Swiftships does not assert that any production deadlines were met. And in fact, the record is clear that all production deadlines

were missed. Swiftships' requests to further extend these delivery deadlines already years behind the original schedule does not absolve the contractor of the contractual consequences of a cure notice and subsequent termination for default.

As for NAVSEA's decision to reclaim materials and supplies from the leased job site reportedly worth $4 million noted in example 10, the agency's actions were authorized by the contract itself and the citation to FAR provision 52.249-8 included at ECF at 1-2 at page 128.

Moreover, the record presented documents that NAVSEA's actions were prompted by a landlord-tenant eviction and property abandonment issues or disputes between Swiftships and CM Tribinox (phonetic), the lessor of the facility, at least as far as it was documented in the contracting officer's decision, ECF 1-6 at 3, paragraph 13. The Government's exercise of this right under the FAR within its discretion cannot evidence bad faith given the circumstances presented.

Finally, in examples 1 and 2, as discussed with counsel today, there are legitimate disagreements over what the contract authorizes and requires regarding design control, but these disputes do not plausibly evidence bad faith on the part of NAVSEA officials. In

example 1, Swiftships cites to language in the contract and in its response to the solicitation that suggests that the contractor had broad authorization and discretion to design the LCU vessels, specifically provision C.1.1.5, which states the contractor is solely responsible for the overall engineering, design, procurement, integration, installation and testing of the craft and any individual systems, ECF 1-2 at 22.

However, provision C.1.1.13, titled Contractor Proposed Alternatives provides the contractor may propose alternate design features for structures or hull form, propulsions and steering and/or craft systems. The phrase "may propose" does not support the claim that Swiftships reasonably expected complete control over the design. Moreover, as discussed with counsel, and as this Court is aware, detailed design is more limited than general design, and NAVSEA was not buying off-the-shelf products or even modified off-the-shelf products. Any communication misunderstandings or any miscommunications or misunderstandings in this regard between the parties are well within the realm of legitimate contract disputes in the performance and management of a construction contract. They do not meet the required level of bad faith.

Example 2 fails for similar reasons. NAVSEA did

not cause or otherwise contribute to the COVID-19 global pandemic or the resulting supply chain disruptions and delays. Furthermore, in response to Swiftships' request for equitable adjustments, NAVSEA reduced the number of deliverables and increased the unit costs. It may not have been the 79 to $80 million that Swiftships was requesting, but it did award an additional $41 million in costs or reimbursements. It may have been only half a loaf, but a half a loaf it was.

And speaking of modification 41, these conclusions do not take into account Swiftships' execution of the clean release affirmatively waiving all claims arising on or before September 1, 2022, which include at least examples 1, 2 and 9.

In examining these 10 examples, the Court has looked at the sum of the parts and the whole, and neither amount, individually or collectively, to the bad faith pleading necessary for this case to move forward. For these reasons, Defendant's motion to dismiss ECF, 7 is granted. The Court will issue a short order adopting today's bench ruling and directing the Clerk of Court to enter judgment accordingly.

Is there anything else I need to know or decide today, Ms. Fleming?

MS. FLEMING: Nothing for the Government, Your

Honor. Thank you.

THE COURT: Mr. Gill?

MR. GILL: Nothing from the Plaintiff, Your Honor. Thank you.

THE COURT: Again, I thank counsel for a well argued case, notwithstanding my misgivings on the briefing of it. And we stand adjourned.

(Whereupon, the proceedings at 12:33 p.m., were concluded.)

CERTIFICATION OF TRANSCRIBER

I, Deborah Wehr, RPR, court-approved transcriber, Certify that the foregoing is a correct transcript from The official electronic sound recording of the Proceedings in the above-titled matter.

DATED: 9/15/2025 s/Deborah Wehr__

DEBORAH WEHR, RPR